UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re ) | | |
| ) | | |
| JOHN J. MURPHY, SR., ) | Case No. 6:04-bk-01612-KSJ | |
| ) | Chapter 7 | |
| Debtor. ) | | |
| ) | | |
| LEACH CONSTRUCTION, INC., ) | | |
| ) | | |
| Plaintiff, ) | Adversary No. 6:04-ap-81 | |
| vs. ) | | |
| ) | | |
| JOHN J. MURPHY, SR., ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

MEMORANDUM OPINION
DETERMINING DEBT DISCHARGEABLE

Leach Construction, Inc., the plaintiff ("Leach"), contends that an alleged debt due to it by the debtor, John J. Murphy, Sr., is not dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.[1]  Leach is a commercial construction company based in Ohio.  Leach signed three construction contracts with Southern Apartment Specialists, Inc. ("SASI"), a company owned by the debtor, to renovate three apartment complexes in the Cleveland area for occupancy by low-income families.  The financing for these three projects came, primarily, from tax exempt bonds issued by local governmental agencies that created very complex approval and payment requirements, and, secondarily, from investor contributions.  At that time, neither Leach nor Murphy had sufficient experience with complicated housing renovations or with complex bond transactions.  Unfortunately, neither Leach nor Murphy anticipated the problems they would and did encounter, and, eventually, SASI filed for bankruptcy relief.  Although Leach received

---

[1] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

several million dollars in payment for its services, SASI did not pay Leach in full. Leach, in the two-count complaint filed initiating this adversary proceeding, now contends that this remaining debt due by SASI to Leach is not dischargeable by Murphy, SASI's owner, in his individual bankruptcy case. Both counts are asserted under Section 523(a)(2)(A) of the Bankruptcy Code.

In determining whether a debt is dischargeable under the various provisions of Section 523 of the Bankruptcy Code, the Court notes that a primary policy underlying our bankruptcy system is the concept of a "fresh start" for the honest debtor by providing much-needed relief from the pressure of his debts. Local Loan Co. v. Hunt, 292 U.S. 234 (1934); Perez v. Campbell, 402 U.S. 637 (1971). Applying this clearly stated policy, the exceptions to discharge delineated in Section 523 of the Bankruptcy Code generally are construed narrowly against a creditor and liberally in favor of the debtor. Accordingly, the creditor has the burden to prove that a particular obligation of the debtor falls within one of the exceptions delineated in Section 523. As noted by the Supreme Court in Grogan v. Garner, 498 U.S. 279 (1991), this burden of proof is satisfied by a preponderance of the evidence.

Bankruptcy Code Section 523(a)(2)(A) excepts from discharge a claim for money, property, services or credit to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." In order to find a debt to be nondischargeable under Section 523(a)(2)(A), Leach must prove that (1) Murphy made a false representation with the purpose and intention of deceiving the creditor; (2) the creditor relied on the representation; (3) the creditor's reliance was justified; and (4) the creditor sustained a loss as a result of the representation. SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998); Johannessen v. Fuller (In re Johannessen), 76 F.3d 347, 350 (11th Cir. 1996); In re Hunter, 780 F.2d 1577, 1579 (11th Cir.1986), abrogated on other grounds by Grogan, 498 U.S. 279. Actual fraud precluding discharge "consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and

cheat another—something said, done, or omitted with the design of perpetrating what is known to be a cheat or deception." McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000); In re Howard, 261 B.R. 513 (Bankr. M.D. Fla. 2001). For the reasons explained below, the Court finds that Leach has failed to demonstrate the requisite elements for non-dischargeability under Bankruptcy Code Section 523(a)(2)(A) and holds that any debt due to Leach by Murphy is dischargeable.[2]

Leach's argument under Section 523(a)(2)(A) is twofold. First, Leach asserts that Murphy committed actual fraud by submitting false certificates of substantial completion to the bond trustees overseeing the construction, receiving the requested payments, and then not paying Leach for the construction services it supplied. Significantly, Leach asserts that these payments "were ultimately diverted to the personal use of" the debtor. (Paragraph 15 of the Second Amended Complaint, Doc. No. 13). Second, Leach contends that Murphy misrepresented SASI's financial strengths and assets in order to induce Leach to enter into the construction contracts when SASI had no intention of paying Leach for its services. In conjunction with this allegation, Leach contends that SASI misrepresented itself as the general contractor on the various projects, when, in fact, Leach was the general contractor.

Murphy denies these allegations. The debtor contends that he never submitted any false affidavits to the bond trustees seeking payment and that any payments received went to pay legitimate debts of SASI. Murphy specifically denies he personally stripped SASI of its cash, other than to take all or a portion of his normal salary. As to the other misrepresentations, Murphy denies that any such misrepresentations were made. Indeed, he points to the fact that

---

[2] The debtor has not received a discharge in this Chapter 7 case because of another pending adversary proceeding, Adversary Proceeding No. 04-154. The plaintiff, Rivertree Landing, LLC, has asserted that the debtor is not entitled to the entry of a discharge due to various grounds brought under Section 727 of the Bankruptcy Code. If the plaintiff prevails in that lawsuit, Murphy may never receive a discharge from any of his debts, including any debt he may owe to Leach Construction, Inc.

SASI paid Leach millions of dollars for its services, and, although Leach was not paid in full, other contractors also were unpaid when SASI filed its bankruptcy case.  Murphy argues that SASI hired Leach with the intention to pay the company in full and to make a profit on these three projects, as well as the projects SASI managed in other locations.  Unfortunately, the costs on all of these projects exceeded the estimated budget, investors did not make expected contributions, and the entire business failed, not due to fraud or deceit, but due to an unfortunate turn in the business.

Murphy formed SASI to rehabilitate and to convert distressed housing into apartments for low-income families in six states, including Florida, Michigan, Ohio, Indiana, and Oklahoma.  The company administered at least 10 separate large-scale projects between 1997 and 1999.  Leach was one of several contractors hired by SASI.

Leach is an established Ohio corporation that, prior to its involvement with SASI, operated a small- to mid-sized commercial construction firm, specializing in rehabilitating condominiums.  Beginning in late 1996, Leach entered into three contracts with SASI to renovate apartment complexes known as Imperial Partners, Ltd., Park Lane Associates, Ltd., and Colonnade Associates, Ltd.  Leach, in its post-trial brief, represented that these projects were "the largest contract of his [sic] career."  (Doc. No. 121, page 10).  The contracts were typical construction agreements.  (Plaintiff's Ex. Nos. 1, 3 and 4).  Leach had never before worked on projects of such complexity, but it pulled the needed permits, issued the notice to owners that construction had commenced, and worked to eventually complete all three projects, albeit with significant disagreements along the way.

Confusion certainly exists as to whether Leach or SASI acted as the general contractor on the projects.  Leach had a direct contract with SASI.  Leach is listed as the contractor in these contracts. (Plaintiff's Ex. Nos. 1, 3, and 4).  In turn, SASI had a separate contract with each of the three entities funding the projects listing SASI as the contractor. (See, for example, Plaintiff's

Ex. No. 2). For most practical purposes, Leach performed the work on the projects. However, SASI administered the project and funding and apparently had some performance responsibilities on the projects. For example, Leach itself contended that SASI was responsible for the elevator and fire safety upgrades at the Colonnade project. Both SASI and Leach filed notices of commencement in connection with the project. (Plaintiff's Ex. No. 21). Ultimately, however, the issue of which entity, Leach or SASI, served as general contractor is irrelevant to the issues raised in this adversary proceeding.

Similar to Leach, SASI had limited or no experience in this industry and never truly understood the difficulties of relying on tax exempt bonds issued by local governmental agencies for financing. Murphy was the controlling shareholder (either individually or through family-owned companies) and president of SASI. He also controlled the company's finances. SASI, however, also had several upper level employees in management positions. Indeed, Murphy only signed one of the three contracts between SASI and Leach. (Plaintiff's Ex. No. 3). Other employees, David Booth and Susan Richardson, signed the other two contracts. Moreover, construction managers, such as David Dalton, supervised Leach's work on the Cleveland projects much more closely than Murphy. SASI clearly was an operating company consisting of more than just the debtor.

As the renovation and construction on the three projects involving Leach proceeded, Leach would submit requests for payment to SASI. (Plaintiff's Ex. Nos. 5, 7 and 9). SASI then would submit periodic Certificates for Payment on the projects to the applicable bond trustees, using standard forms developed by the American Institute of Architects. (Plaintiff's Ex. Nos. 6, 8, and 10). Each certificate was submitted only after an impartial inspector had inspected and approved the work completed. Leach never saw or relied on any information contained in these statements. Only the bond trustees reviewed the certificates and then typically approved the requests, sometimes after asking additional questions or asking for more information. SASI

received payments from the bond trustees and usually deposited the monies into its general operating account or into individual accounts maintained for each project. The monies were used to pay SASI's normal operating expenses, which included payments to Leach and to the other contractors working on SASI's other projects. Leach failed to prove that Murphy individually received any monies from the three projects involving Leach, other than his normal salary, which Murphy voluntarily reduced as the business began to fail.

Leach received substantial payments from its work. Leach's own draw requests indicate that it received almost $1.7 million on the Imperial House project, over $3.1 million on the Park Lane project, and approximately $1.8 million on the Colonnade project. (Plaintiff's Ex. Nos. 5, 7 and 9). Therefore, Leach received more than $6.6 million from SASI in connection with the three projects.

Neither SASI nor Murphy held up legitimate payments due to Leach in order to force Leach to accept less than the contract price or to extract unreasonable reductions for change orders. Renovating large, multi-story older buildings presents extreme challenges. In these three projects, neither SASI nor Leach had ever before faced these types of challenges. They were both inexperienced in how to handle the spiraling problems on these three projects and the other SASI projects. Perhaps Leach did not properly estimate the cost to complete the renovation, or, perhaps, the buildings required work no one could have anticipated. But, in any event, SASI did not have the extra money needed to pay for the extra work and the required changes. Neither Murphy nor SASI took any improper actions to force Leach to accept unfavorable terms as these unanticipated changes arose.

Rather, as the construction proceeded, the parties were in constant communication about the needed changes and the completion of the work. Some formal change orders were signed. However, the real dispute between the parties arose when there was increasing confusion as to what was and what was not covered by the original contract or a particular change order. A

dispute also arose over who was responsible for particular aspects of the project. For example, on the Colonnade project, both Leach and SASI contended the other was responsible for the completion of fire safety and elevator and electrical upgrades. Other disputes involved the rate at which Leach was completing the work, which, according to Murphy, was too slow to allow SASI to rent apartments and generate the rental income needed to pay the rapidly mounting and unexpected construction costs.

As these disputes escalated, the parties wrote numerous letters back and forth, each blaming the other for the delays and cost overruns. (Plaintiff's Ex. No. 20). Lawyers got involved. During the summer and fall of 1998, the parties were in constant disagreement. Leach chose to stay on the project, in an attempt to complete the work, limit his liability, and, perhaps, realize some profit. Eventually, the disputes between the parties magnified, and, on November 11, 1998, SASI terminated Leach. (Plaintiff's Ex. No. 20LL).

Still unpaid, Leach instituted an arbitration action against SASI. Leach was overall successful in the arbitration process receiving awards against SASI in the following amounts: $197,346.16 (Imperial House), $987,936.54 (Colonnade), and $1,044,880.31 (Park Lane). (Plaintiff's Ex. No. 23). However, SASI did reduce these damages, somewhat, by winning on its counterclaim against Leach, in connection with the Imperial House project, and receiving a setoff award of $35,938.98. The arbitrators apparently realized that, at least to this one project, Leach had some further responsibility to SASI on the project. Clearly, however, SASI owes and has not paid over $2 million plus accruing interest to Leach for its work on the three projects.

By the time the arbitration awards were entered, SASI was in financial difficulty on all of its projects, not just the three involving Leach. Employees were no longer being paid regularly. Murphy was taking no salary. The money had run out. The company filed for bankruptcy relief under Chapter 7 on December 28, 2000. No assets were located. Creditors in the corporate bankruptcy received no distributions on their claims which exceeded $25 million.

Turning back to Leach's claims, the Court finds that Murphy committed no actual fraud or made any false representations to Leach with the purpose and intention of deceiving the company. Leach first claims that SASI submitted false statements of substantial completion to the bond trustees requesting interim payments on the project. Leach did not prove the statements provided by SASI to the bond trustees were false. Moreover, even if they were inaccurate, the affidavits were submitted to the bond trustees, *not* Leach. The plaintiff simply never saw the statements and, therefore, could not have justifiably relied on the certificates in making its decision to continue working on the SASI projects.

Leach did prove that SASI did not immediately pay Leach from funds received from the bond trustees; however, this failure to immediately transmit payment does not constitute actual fraud. Leach essentially argues that the monies should have been earmarked for payment to Leach, and only to Leach, for its services. Of course, no such earmarking agreement existed or was ever promised by SASI. Certainly, Leach was not paid for all of its work for SASI, and SASI likely received payment from the bond trustees for at least some of this unpaid work; however, many other similarly situated creditors also were unpaid.

SASI simply did not have enough funds to pay everyone in full and, thus, filed for bankruptcy relief. A business failure alone does not and should not establish the type of fraud or misrepresentation sufficient to make a debt non-dischargeable. If that were the standard, every debt in every bankruptcy case would be non-dischargeable. Leach has failed to prove any actual fraud, as alleged in its first count, which would make any debt due by Murphy to Leach non-dischargeable.

As to the second count of Leach's complaint, Leach contends that Murphy initially misrepresented SASI's financial strengths and assets in order to induce Leach to enter into the construction contracts, when SASI had no intention of paying Leach for its services. Disregarding the fact that Leach *was* paid $6.6 million for its work, the Court concludes that

neither Murphy nor any other SASI representatives made any misrepresentations regarding SASI's financial condition. SASI's funding came from two sources—the bond monies and investor contributions. The bond monies were never sufficient to pay all costs associated with construction. Leach knew, or should have known, that SASI would seek extra funds, primarily equity investments from limited partners, to pay for the change orders and over-budget items that arose during the construction phase. When the investor funds in the needed amounts did not materialize, SASI was unable to pay its bills. The company's financial condition spiraled downward, eventually resulting in the bankruptcy filing. At the time the contracts with Leach were signed, no one expected this financial collapse. SASI signed the contracts expecting to pay Leach in full. The Court specifically finds that no one at SASI, including Murphy, ever promised Leach that the bond monies alone were sufficient to pay all construction costs, including the unexpected over-runs and change orders.

Nor did SASI or the bond trustees rely exclusively on Leach's estimated budget in obtaining the bond amounts. The governmental agencies issuing the bonds were well along in the bond approval process before Leach signed his first contract with SASI. They necessarily could not have relied on Leach's budget because the bonds were issued within days or weeks of the signing of the contracts. Indeed, Leach started construction almost immediately after signing the first contract and could not have done so if the bonds had not already been approved for issuance. Therefore, although it is possible that the governmental agencies issuing the bonds reviewed Leach's contract and his budget, they never based their decision to fund the bonds exclusively on his estimated construction costs.

Certainly, Mr. Leach in his testimony strongly believes that he was guaranteed that the bond monies would be sufficient to pay his contract fee; however, the Court can only conclude that he misunderstood the way complicated bond financing works. He did not reach this conclusion based on any misrepresentation made by Murphy or any SASI representative. As

such, the plaintiff has failed to prove any basis to make any debt due by Murphy to Leach non-dischargeable as alleged in count two.

In conclusion, the Court finds that neither SASI nor Murphy made any false representations to Leach with the purpose and intention of deceiving the company. As such, Leach could not justifiably rely on representations that were never made. Certainly, Leach remains unpaid, together with other contractors holding claims of approximately $25 million, but the loss is not due to fraud or misrepresentations. The plaintiff has failed to prove the elements necessary to make any debt due by Murphy to Leach non-dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code. A separate judgment will be entered in favor of the debtor and against the plaintiff consistent with this Memorandum Opinion.

DONE AND ORDERED in Orlando, Florida, on the 22nd day of May, 2007.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Debtor/Defendant's attorney: Raymond J. Rotella, Kosto & Rotella PA, 619 East Washington Street, Orlando, FL 32801

Plaintiff's attorney: David J. Horvath, 7100 E. Pleasant Valley Ste 100, Independence, OH 44131

Plaintiff's attorney: Jeffrey C. Sparks, P.O. Box 511, Gotha, FL 34734